UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

CITADEL EQUITY FUND LTD., and
CITADEL CREDIT TRADING LTD.,

                  Plaintiffs,

   - against -

AQUILA, INC.,

                  Defendant.

----------------------------------------X

04 Civ. 8145 (RWS)

O P I N I O N

A P P E A R A N C E S:

    KASOWITZ, BENSON, TORRES & FRIEDMAN
    Attorneys for Plaintiffs
    1633 Broadway
    New York, NY 10019
    By:  ADAM L. SHIFF, ESQ.
        MICHAEL C. HARWOOD, ESQ.
        <u>Of Counsel</u>

    MILBANK, TWEED, HADLEY & McCLOY
    Attorneys for Defendant
    One Chase Manhattan Plaza
    New York, NY 10005
    By:  SCOTT A. EDELMAN, ESQ.
        MICHAEL A. BERG, ESQ.
        <u>Of Counsel</u>



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/18/05

Sweet, D.J.,

Defendant Aquila, Inc. ("Aquila" or the "Borrower") has moved under Rule 12(b)(6), Fed. R. Civ. P., to dismiss the complaint of plaintiffs Citadel Equity Fund Ltd. and Citadel Credit Trading Ltd. (collectively, "the Citadel Funds"), which seeks to enforce a particular prepayment premium under a credit agreement entered into by Aquila. For the reasons set forth below, the motion is granted.

At issue is the $27 million prepayment amount sought by the Citadel Funds on behalf of certain of Aquila's creditors and the differing interpretations of the carefully negotiated credit agreement under which Aquila obtained approximately $430 million of financing. The parties are sophisticated and well advised. This dispute demonstrates that the disposition of substantial sums of money can result in surprisingly different views of the most carefully contemplated contract.

**The Parties**

Aquila is a Missouri-based corporation that operates electricity and natural gas distribution utilities and owns and operates power generation assets. In April 2003, Aquila entered into a credit agreement pursuant to which a syndicate of lenders extended $430 million in credit to Aquila, apparently in the form

1

of term loans and letters of credit (the "Credit Agreement" and the "Loans").

The Citadel Funds are private investment funds, both Cayman Island entities. The Citadel Funds hold $62,826,095.22 of loans subject to the Credit Agreement.

## Prior Proceedings

The Citadel Funds' complaint was filed on October 15, 2004. The first two counts allege breach of contract, and the third count seeks a declaratory judgment that, pursuant to the Credit Agreement, they are entitled to a pro rata share of funds currently held in escrow. Aquila's motion to dismiss the complaint was heard and marked fully submitted on February 4, 2005.

## The Facts

The following facts are drawn from the complaint, which includes "any documents incorporated in it by reference, annexed to it as an exhibit, or 'integral' to it because it 'relies heavily upon [such document's] terms and effect.'" Pollock v. Ridge, 310 F. Supp. 2d 519, 524 (W.D.N.Y. 2004) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations omitted)). All well-pleaded allegations are accepted as true for

the purpose of this motion. See Chambers, 282 F.3d at 152. The following statements do not constitute findings of the Court.

## A.    The Credit Agreement

On or about April 9, 2003, Aquila entered into the Credit Agreement with a syndicate of lenders. This Agreement provided credit to Aquila in the form of term loans and letters of credit in an aggregate principal amount not in excess of $430,000,000. The Credit Agreement was negotiated by Credit Suisse First Boston ("CSFB") as the administrative agent of the credit facility.[1] The scheduled maturity date of the loans under the Credit Agreement was May 15, 2006.

At the time Aquila entered into the Credit Agreement, it had debt obligations with preexisting creditors. In particular, Aquila owed $250 million under a series of 7.00% Senior Notes (the "7.00% Senior Notes") due on July 15, 2004, and it owed $150 million under a series of 6.875% Senior Notes (the "6.875% Senior Notes") due on October 1, 2004 (collectively, the "Senior Notes").

The Credit Agreement required Aquila to prepay its obligations pursuant to the Credit Agreement if it failed to take specified actions relating to timely payment of the Senior Notes.

---

[1] CSFB was represented in this matter by the law firm of Dewey Ballantine LLP.

the purpose of this motion.  See Chambers, 282 F.3d at 152.  The following statements do not constitute findings of the Court.

## A.    The Credit Agreement

On or about April 9, 2003, Aquila entered into the Credit Agreement with a syndicate of lenders.  This Agreement provided credit to Aquila in the form of term loans and letters of credit in an aggregate principal amount not in excess of $430,000,000.  The Credit Agreement was negotiated by Credit Suisse First Boston ("CSFB") as the administrative agent of the credit facility.[1]  The scheduled maturity date of the loans under the Credit Agreement was May 15, 2006.

At the time Aquila entered into the Credit Agreement, it had debt obligations with preexisting creditors.  In particular, Aquila owed $250 million under a series of 7.00% Senior Notes (the "7.00% Senior Notes") due on July 15, 2004, and it owed $150 million under a series of 6.875% Senior Notes (the "6.875% Senior Notes") due on October 1, 2004 (collectively, the "Senior Notes").

The Credit Agreement required Aquila to prepay its obligations pursuant to the Credit Agreement if it failed to take specified actions relating to timely payment of the Senior Notes.

---

[1] CSFB was represented in this matter by the law firm of Dewey Ballentine LLP.

Specifically, Section 2.7(d) of the Credit Agreement, entitled "SPECIAL MANDATORY PREPAYMENT," provided in pertinent part as follows:

> If (a) the Borrower does not consummate an exchange offer, tender offer, refinancing or otherwise consummate retirement transactions with respect to, or otherwise economically or legally defease (i) at least 80% in aggregate principal amount outstanding on March 21, 2003 of the 7.00% Senior Notes on or before July 1, 2004 or (ii) at least 80% in aggregate principal amount outstanding on March 21, 2003 of the 6.875% Senior Notes on or before September 15, 2004, ... then ... the Loans shall become due and payable in full on July 1, 2004 or September 15, 2004, as applicable ... .

(Compl. Ex. A at 40.)

In the event that mandatory prepayment was triggered pursuant to Section 2.7(d), Aquila was required to pay a fee equivalent to "two percent (2%) of the aggregate principal amount of the Loans and the Total Credit-Linked Deposits then outstanding." (Id.) Section 2.7(d) further provided that "[n]o other Make Whole Premium [would] be due as a result of such mandatory prepayment." (Id.)

According to Citadel, the purpose of Section 2.7(d) was to protect the lenders against the risk that Aquila would fail to pay, refinance, retire, or otherwise defease the Senior Notes in a timely manner. Citadel and the other lenders had an interest in seeing that Aquila met its obligations under the Senior Notes in

4

order to protect the lenders from a cross-default that could interfere with their economic interest in the outstanding loans under the Credit Agreement.

Pursuant to Section 9.1 of the Credit Agreement, Aquila's lenders had the power to waive the requirements imposed on Aquila pursuant to Section 2.7(d). Entitled "AMENDMENTS AND WAIVERS," Section 9.1 provides in pertinent part as follows:

> The Required Lenders[2] may, ... from time to time, (a) enter into with [Aquila] written amendments, supplements or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of the Lenders or [Aquila] hereunder, ... or (c) waive ... any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; PROVIDED that no such waiver ... (i) shall reduce the principal amount or extend the scheduled date of maturity of the Loan or [Letter of Credit] Disbursement of any Lender or of any installment thereof, or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Commitment, in each case, without the consent of such Lender ... .

(Id. Ex. A at 81.)

The Credit Agreement also contained a term governing Aquila's obligations in the event that it opted to voluntarily prepay its loan obligations. Entitled "OPTIONAL PREPAYMENT,"

---

[2] As defined in Section 1.1 of the Credit Agreement, the term "Required Lenders" means "Lenders having Commitments ... representing more than 50% of the aggregate of all Commitments outstanding at such time." (See Compl. Ex. A at 24.)

Section 2.7(a) of the Credit Agreement provided in pertinent part as follows:

> The Borrower may, at any time and from time to time prepay the Loans or direct the Administrative Agent to reduce the then unused portion of the Total Credit-Linked Deposits, upon at least three Business Days' irrevocable written notice, to the Administrative Agent ... . If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with the Make-Whole Premium, if any, due with respect thereto.

(Id. Ex. A at 36.)

Pursuant to Section 2.7(a), if Aquila opted to effect optional prepayment, it was required to pay a "Make Whole Premium." (Id.) Pursuant to Section 1.1 of the Credit Agreement, the Section 2.7(a) Make Whole Premium was calculated as the discounted present value of the remaining principal and interest payments owing under the Credit Agreement through the maturity date less the amount of the principal being repaid. (See id. Ex. A at 18.)

## B.   The Events Giving Rise To The Dispute

In the quarterly financial statement[3] signed by its chief financial officer on August 4, 2004, Aquila stated that on June 30,

---

[3] In the context of a Rule 12(b)(6) motion, the Court may take judicial notice of facts contained in public records.  See, e.g., Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004).

2004, it had irrevocably deposited $258.8 million with the trustee for the 7.00% Senior Notes due on July 15, 2004, thereby economically defeasing this obligation. (<u>See</u> Aquila Inc. Form 10-Q for the Quarterly Period ended June 30, 2004 ("the June 30, 2004 10-Q"), at 18.) Aquila further stated that the 7.00% Senior Notes were retired on July 15, 2004. (<u>See</u> <u>id.</u>)

On or about August 2, 2004, Aquila initiated two securities offerings, one involving shares of common stock and the other involving premium equity securities (PIES). In an August 18, 2004 supplement to the prospectus for the common stock offering, Aquila stated that it "intend[ed] to use the net proceeds from this offering and our concurrent offering of the PIES to . . . fund the retirement of the $250.0 million of 7.00% senior notes due July 15, 2004 and of the $150.0 million of 6.875% senior notes due on October 1, 2004 . . . ." (Compl. ¶ 34.)

On August 24, 2004, Aquila issued a press release announcing: (1) that it had completed the offerings of the common stock and the PIES; that these offerings had generated $447.4 million in proceeds for Aquila; and (3) that Aquila intended to use these proceeds to retire long-term debt and other liabilities. (<u>See</u> <u>id.</u> Ex. H.)

On September 1, 2004, Aquila issued a press release stating that it planned to prepay its obligations pursuant to the

Credit Agreement. Aquila announced that "it intend[ed] to retire its existing $430 million secured credit facility and enter into two new unsecured, working capital facilities." (Id. Ex. B.) The press release added that Aquila "anticipate[d] this occurring prior to or on September 16, 2004," and that "[the] transactions [were] expected to reduce [Aquila's] aggregate debt outstanding by approximately $230 million and lower [Aquila's] annual interest expense." (Id.)

On September 8, 2004, the Citadel Funds faxed a letter to Aquila asserting that Aquila's anticipated prepayment of the loans, as described in the September 1, 2004 news release, would be an "Optional Prepayment" pursuant to Section 2.7(a) of the Credit Agreement, and thus would require payment of the Section 2.7(a) Make-Whole Premium. (See id. Ex. C at 1-2.) The Citadel Funds also asserted that "the proposed prepayment of the Loans does not qualify as a 'Special Mandatory [Pr]epayment' as set forth in Section 2.7(d) of the Credit Agreement, as the conditions set forth therein have not been, and cannot be, satisfied to trigger such a payment." (Id. Ex. C at 1.)

In a faxed letter dated September 10, 2004, Aquila advised the Citadel Funds that the necessary preconditions for prepayment under Section 2.7(d) had been satisfied, and that Aquila would prepay the Loans by means of the Special Mandatory Prepayment. (See id. Ex. D.) Specifically, the letter noted that

8

Section 2.7(d) had been triggered "because less than 80% of the Senior Notes will be retired or defeased on or before September 15, 2004, and . . . the Maturity Date of the Senior Notes will not be extended." (See id.)

On September 14, 2004, Required Lenders holding two-thirds of the outstanding debt under the credit facility faxed to Aquila and CSFB a document stating that they had "waive[d] the requirement that [Aquila] comply with section 2.7(d) of the Credit Agreement and any default or acceleration of the Loans that, if not for such waiver, would arise under such Section 2.7(d). . . ." (See id. Ex. F.)

By September 15, 2004, Aquila had not completed an exchange offer, tender offer, refinancing, or other retirement transaction with respect to 80% of the 6.875% Senior Notes. (See Aquila Inc. Form 10-K for the Fiscal Year ended December 31, 2004, at 117.)

On or about September 15, 2004, Aquila completed the issuance of two unsecured credit facilities of $330 million in the aggregate.

Also on September 15, 2004, pursuant to the provisions of Section 2.7(d), Aquila tendered to CSFB $430,000, an amount equivalent to 102% of the debt then outstanding under the Credit

9

Agreement. Upon making such payment, Aquila sought release from CSFB of the approximately $1 billion that was held as collateral to secure the loans issued pursuant to the Credit Agreement. Acting through CSFB, the lenders refused to release this collateral unless Aquila placed into escrow approximately $27,303,000, an amount representing the difference between the Section 2.7(d) 2% prepayment fee paid by Aquila and the Section 2.7(a) Make-Whole Premium claimed by the lenders.

Aquila acceded to this request, and $27,303,000[1] was placed into an escrow account maintained by CSFB on September 15, 2004. Pursuant to the escrow agreement, these funds have been held pending a court order directing their release.

This action concerns the disposition of the $27 million in escrow funds.

## C.    **The Issues**

The above-described events raise two fundamental issues. First, did Aquila's conduct with respect to the 6.875% Senior Notes trigger Section 2.7(d)'s mandatory prepayment requirement? Second, if Section 2.7(d)'s mandatory prepayment requirement was triggered,

---

[1] The Citadel Funds do not concede that this amount was properly calculated or that it will be sufficient to pay all appropriate costs and interest on their claim.

did the Required Lenders make an effective waiver of this obligation?

The resolution of these issues as set forth below results in the granting of Aquila's motion, the dismissal of the Citadel Funds' complaint, and an order that the $27 million currently held in escrow be returned to Aquila.

## Discussion

### A.    Jurisdiction and Choice of Law

The parties do not dispute that the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Furthermore, pursuant to Section 9.13 of the Credit Agreement, this action is governed by the applicable substantive law of the state of New York. (See id. Ex. A at 89.) There is no dispute as to the validity of this choice of law provision.

### B.    Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)). "The

11

issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000).

Issues of contract interpretation "are generally matters of law and therefore [are] suitable for disposition on a motion to dismiss." Thayer v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000) (internal quotation marks and citation omitted); see also Lind v. Vanguard Offset Printers, Inc., 857 F. Supp. 1060, 1065 (S.D.N.Y. 1994). Furthermore, in deciding a motion to dismiss, the Court may consider exhibits to the complaint and documents incorporated in the complaint by reference. See, Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## C. Applicable State Law

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

12

**D.    Aquila's Conduct Triggered Section 2.7(d)'s Manda-
tory Prepayment Provision**

Under Section 2.7(d) of the Credit Agreement, mandatory
prepayment would not be triggered if Aquila took any of the
following steps by September 15, 2004 with respect to 80% of the
amount owed on the 6.875% Notes[5]: (1) consummating an exchange
offer, (2) consummating a tender offer, (3) consummating a
refinancing, (4) consummating some other retirement transaction,
(5) legally defeasing the obligation, or (6) economically defeasing
the obligation.

The Citadel Funds do not attempt to argue that by
September 15, 2004, Aquila had consummated an exchange offer,
tender offer, refinancing, other retirement transaction, or had
otherwise legally defeased its obligation with respect to the
6.875% Senior Notes. Rather, the Citadel Funds argue that Aquila's
actions in August 2004 -- i.e., the offerings of the common stock
and the PIES and the designation of the funds thereby raised for
the purpose of retiring the 6.875% Senior Notes -- constituted
economic defeasance of this obligation. The Citadel Funds assert
that as a result of this economic defeasance, the section 2.7(d)
Mandatory Prepay Provision was not triggered, and Aquila's failure

---

[5] As described above, Aquila does not dispute that it satis-
fied by July 1, 2004 the Section 2.7(d) obligation with respect to
the 7.00% Senior Notes.

13

to pay the Section 2.7(a) Make Whole Premium therefore constituted a breach of the Credit Agreement.

The Credit Agreement provided no express definition for the terms "defease" or "economic defeasance." Therefore, it is appropriate, pursuant to New York contract law, to consult dictionaries and relevant treatises to ascertain the accepted meaning of these terms. See, e.g., Mazzola v. County of Suffolk, 143 A.D.2d 734, 734, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) (consulting dictionary for meaning of "condemned" and "condemnation"); R/S Assocs. v. New York Job Dev. Auth., 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 360, 771 N.E.2d 240, 242 (2002) (relying on dictionary definition of "effective" in construing the contractual phrase "effective cost of funds").

The term "defeasance" is defined as follows: "1. An annulment or rendering void. 2. The voiding of a contract or deed. . . ." The American Heritage Dictionary Of The English Language 345 (1981). The term "defeance" connotes finality. One federal court, analyzing a contract that established an employee stock option plan "subject to defeasance" by a vote of the shareholders, explained that the term "'defeasance' is derived from the past participle of the French verb desfaire[,] which means to undo. It is defined: 1. A rendering null and void. 2. A condition the fulfillment of which avoids an instrument." Gruber v.

14

Chesapeake & Ohio Ry. Co., 158 F. Supp. 593, 600 (N.D. Ohio 1958) (citing Webster's Collegiatge Dictionary (5th ed.)).

In the context of debtor/creditor law, the term "defeasance" means "release from an obligation or debt." Jay Alix, Robert J. Rock, Ted Stenger, Fin. Handbook for Bankr. Prof'ls (Glossary) (2d ed. 1996). Such release from an obligation can take one of two forms: either legal or in-substance. Att'y Handbook of Acct., Auditing & Fin. Plan. § 5.04[2][e] (2004).

"Legal defeasance" describes the process whereby "the debtor is legally released from being the primary obligor under the debt, either judicially or by the debtor." Id. "In-substance defeasance" describes the process whereby "the debtor irrevocably places cash or other monetary assets in a trust to be used solely for satisfying scheduled payments of both interest and principal of a specific obligation . . . ." Id.; see also Alix, Rock, Stenger, Fin. Handbook for Bankr. Prof's § 10.18 n.1 (stating that "[a] bond issuer is not legally defeased, i.e., released from its obligations under the terms and conditions of the debt agreement[,] unless the debt indenture contains specific provisions for such eventuality. Bond issues which are extinguished in the absence of such provisions are thus said to be `in-substance defeased'"); Charles J. Woelfel, Encyclopedia of Banking and Finances, 285 (10th ed. 1994).

15

Based on the foregoing, it is reasonable to conclude that although Section 2.7(d) uses slightly different terminology, the two forms of defeasement contemplated therein are "legal" and "in-substance."

The complaint contains no allegation suggesting: (1) that Aquila's obligation to the 6.875% Senior Note holders was terminated (i.e., that the obligation was legally defeased) or (2) that Aquila placed any assets into an irrevocable trust for the sole purpose of repaying the 6.875% Senior Notes (i.e., that the obligation was in-substance defeased).

Thus, as of September 15, 2004, Aquila remained obligated to repay the 6.875% Senior Notes according to their terms, the notes were continuing to accrue interest, and the holders of those notes remained exposed to the same risks as any of Aquila's creditors. In short, Aquila failed to take any of the steps that would have forestalled the triggering of Section 2.7(d)'s mandatory prepayment provision.

The Citadel Funds' have argued that, pursuant to the terms of Section 2.7(d), mandatory prepayment could be avoided merely by contemplating, preparing for, or announcing an intended defeasance. However, there is no mention of such preparatory steps in the text of Section 2.7(d). Moreover, the Citadel Funds' argument ignores the well established proposition that a defeasance

16

occurs when a debtor terminates its obligation to a creditor -- not when the debtor forms an intention to do so. See, e.g., Desser v. Schatz, 182 A.D.2d 478,480, 581 N.Y.S.2d 796, 797 (1st Dep't 1992) (explaining that a creditor "acquires a defeasible title [to mortgages collateralizing debt], subject to termination upon payment of the debt for which the mortgage was assigned as security"); Bank of Tokyo Trust Co. v. Urban Food Malls Ltd., 229 A.D.2d 14, 23, 650 N.Y.S.2d 654, 661 (1st Dep't 1996) (describing a pledgee's "defeasible title . . . [as being] extinguished upon payment of the debt").

Contrary to the Citadel Funds' arguments, the August 18, 2004 prospectus supplements contain no statements that could be interpreted to signify that in-substance defeasance of the 6.875% Senior Notes had been affected. Rather, the supplements merely state that "the pro forma balance sheet data gives effect to" transactions including "[t]he repayment of the $150.0 million of our 6.875% senior notes due October 1, 2004, from the proceeds of the offerings." (Supplement to Prospectus Dated August 2, 2004 in Connection with the Offering of 40,000,000 Shares of Aquila Common Stock, at S-12; Supplement to Prospectus Dated August 2, 2004 in Connection with the Offering of 12,000,000 Premium Equity Securities, at S-14).

The construction of the term economic "defeasance" here adopted -- i.e., that it is synonymous with the term "in-substance

17

defeasance" -- is buttressed by Aquila's conduct with respect to the 7.00% Senior Notes. As revealed by the June 30, 2004 10-Q, Aquila satisfied its Section 2.7(d) obligation with respect to these notes on June 30, 2004 by irrevocable deposit of $258.8 million with the trustee for the 7.00% Senior Notes. In contrast, in the case of the 6.875% Senior Notes at issue here, there is no allegation that Aquila irrevocably transferred any funds by the September 15, 2004 deadline set forth in Section 2.7(d).

Based on the foregoing, it is determined that Aquila's conduct with respect to the 6.875% Senior Notes triggered Section 2.7(d)'s mandatory prepayment obligation.

**E.** **The Required Lenders' Waiver Of The Section 2.7(d) Mandatory Prepayment Was Not Effective**

According to the Citadel Funds, the Required Lenders effectively waived the Section 2.7(d) mandatory prepayment obligation on September 14, 2004. This waiver, the Citadel Funds argue, barred Aquila from availing itself of the Section 2.7(d) prepayment provisions.

According to Aquila, the Required Lenders had no right under the Credit Agreement to waive the operation of Section 2.7(d). According to Aquila, the Credit Agreement provided that unless a retirement, refinancing or defeasance occurred with respect to the 6.875% Senior Notes, the Loans would become due and

18

payable without giving any discretion in the matter to the Lenders. Aquila argues that pursuant to Section 9.1(a) of the Credit Agreement, to the extent that either party wanted to avoid a special mandatory prepayment under Section 2.7(d), that party's recourse would have been to obtain the agreement of the other party to amend the Credit Agreement in writing. Aquila further argues that even if Section 2.7(d) was capable of being waived by the Lenders under the Credit Agreement, any such waiver required unanimity of the Lenders, and not just the two-thirds that granted the waiver in this case.

The default provision in Section 7.1 of the Credit Agreement illustrates that when the parties intended the lenders to have an option as to whether to declare the Loans "due and payable," the parties provided for that option with express contractual language. To wit, Section 7.1(k)(B) provided that when a default occurred:

> either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, by notice to the Borrower, declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans, LC Disbursements hereunder and the Notes to be due and payable forthwith, whereupon the same shall immediately become due and payable.

(Compl. Ex. A at 78.)

Thus, pursuant to Section 7.1(k)(B), in the case of most types of default, the Loans would only become due and payable if the Required Lenders so elected. In contrast, under Section 2.7(d), prepayment of the Loans was mandatory upon the occurrence of the preconditions set forth therein. Under the occurrence of such preconditions, the Loans became "due and payable" without any action on the part of the lenders, and the lenders were not provided any option to reject the special mandatory prepayment and the accompanying 2% fee, as they were in the event of most other defaults.

Furthermore, as a matter of contract law, the Required Lenders could not have waived Section 2.7(d)'s mandatory prepayment provision without Aquila's consent. It is well established that although a party may waive a provision included in a contract for that party's sole benefit, a party cannot waive a contractual requirement that benefits both sides to the transaction. See Prayer v. Remsen Assocs., 150 A.D.2d 540, 541, 541 N.Y.S.2d 440, 441 (2d Dep't 1989) (refusing to give effect to purported waiver of condition without seller's assent, because the condition benefitted both purchaser and seller, even though condition specified that it was "for the benefit of the Purchaser"); Louis Bonavita & Sons, Inc. v. Quarry, 126 A.D.2d 707, 708, 511 N.Y.S.2d 120, 121 (2d Dep't 1987) (holding that buyer could not waive condition intended to benefit both buyer and seller); Poquott Dev. Corp. v. Johnson, 104 A.D.2d 442, 443, 478 N.Y.S.2d 960, 962 (2d Dep't 1984) (holding

that condition for benefit of both parties "could not be waived unless both parties agreed"); Oak Bee Corp. v. N.E. Blankman & Co., 154 A.D.2d 3, 7, 551 N.Y.S.2d 559, 561 (2d Dep't 1990) (holding that where a "condition has been inserted for the benefit of both parties to the agreement, either party may validly cancel the contract upon failure of the condition, and the condition may be waived only by the mutual assent of both parties"); 13 Williston on Contracts § 39:24 (4th ed.) (stating that "waiver of contract requirements and conditions may not be made unilaterally where the waiver would deprive the nonwaiving party of a benefit under the provision in question.")

Section 2.7(d)'s mandatory prepayment provision provided benefits to both parties. As described in their complaint, the Citadel Funds received a degree of protection against the risk that Aquila might default on the Senior Notes. As Aquila explained in a press release issued on September 20, 2004, by prepaying the Loans and entering into two new unsecured credit facilities, Aquila took an "important step . . . to ensure the company has sound liquidity while improving our capital structure." (Compl. Ex. I.) As Section 2.7(d) permitted Aquila to take this economically advantageous step, and because it provided that Aquila would not be required to pay a Make-Whole Premium, it conferred substantial benefits upon Aquila and could not be waived unilaterally by the Required Lenders.

21

Even if the Required Lenders had the authority to waive or amend unilaterally Aquila's right to prepay the Loans under Section 2.7(d), the waiver at issue here was invalid because it was not based on the unanimous consent of all the lenders. Although the Required Lenders had the authority to waive some of Aquila's contractual obligations, Section 9.1(c) expressly carved out an exception for any waiver that would "extend the date of maturity" of any loan, "extend the scheduled date of any payment" or "extend the expiration date of any Lender's Commitment[.]" (Compl. Ex. A at 81.) In such cases, unanimous consent of all affected lenders was required.

By operation of Section 2.7(d), because Aquila had not refinanced, retired or otherwise defeased the 6.875% Senior Notes by September 15, 2004, that date became the maturity date and scheduled payment date for all remaining payments under the Credit Agreement, including principal, interest and the 2% prepayment fee. September 15, 2004 also became the expiration date for all of the Lenders' commitments; Section 2.7(d) expressly provided that in the event of a Special Mandatory Prepayment, "the Lenders' . . . obligations hereunder to extend any additional credit shall terminate in full." (Id. Ex. A at 40.)

The waiver sought to postpone the maturity date, scheduled payment date and the termination date of the lenders' commitments from September 15, 2004 to May 15, 2006, the original

22

maturity date of the loans under the Credit Agreement. As a result, Section 9.1 required that such "waiver" be approved by all of the Lenders.

The complaint alleges that lenders representing only two-thirds of the Loans executed the waiver. Under the terms of Section 9.1(c), the waiver was an ineffective attempt to extend the maturity date and repayment date of the Loans and the lenders' commitments beyond the contractually specified and scheduled prepayment date of September 15, 2004.

In its attempt to characterize Section 9.1(c) as a substantive provision that expands the lenders' rights, the Citadel Funds contend that Section 9.1(c) provided the lenders with the right to waive any requirement that the contract imposed on Aquila. However, Section 9.1(c) provided that 50% of the lenders may waive any of the requirements of the Agreement. It did not distinguish between waivers of the "requirements" imposed on Aquila and those imposed on the lenders. Thus, if Citadel's argument that Section 9.1(c) created substantive rights were accepted, it would lead to the conclusion that the lenders had the right to waive their own contractual obligations.

The more natural reading of Section 9.1(c) is that the section defined the circumstances in which a majority, but less than all, of the lenders could exercise the rights of waiver

23

provided pursuant to the Credit Agreement. The section does not create substantive rights.

In the alternative, the Citadel Funds argue that unanimous lender approval of the waiver was not required because such waiver did not extend the maturity date of the obligations under the Credit Agreement beyond the original date of May 15, 2006. However, Section 9.1(c) is not limited to extensions beyond the original date of maturity. Rather, it states that unanimity among the lenders is required to extend any "scheduled date of maturity." By its operation, Section 2.7(d), in the absence of the waiver, would have made September 15, 2004 the scheduled maturity date. Therefore, unanimous consent from the lenders was necessary to extend that maturity date.

The Citadel Funds also argue that Section 9.1(c) does not require unanimous consent to extend a payment deadline or maturity date, but only the consent of each lender affected by the extension. This argument is undermined by Section 9.1 of the Credit Agreement, which expressly provides that "[a]ny such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders . . . ." (Id. Ex. A at 81.) The Citadel Funds' argument reads that language out of the Credit Agreement altogether.[6]

---

[6] Citadel argues that unanimity should not be required under Section 9(c)(i) because that provision does not require "the written consent of all the Lenders," as does the following

Finally, the Citadel Funds argue that Aquila cannot use the unanimity requirement as a defense to the Citadel Funds' contract claims because any such requirement would have been for the protection of lenders who did not sign the waiver letter, and not for the protection of the borrower. However, Section 9.1 requires Aquila to deal with all of the lenders as a group. Here, it is not disputed that approximately one-third of the lenders did not grant the waiver. As a result, the waiver was without legal effect and Aquila could not, consistent with the rights of the non-consenting Lenders, have ignored the mandatory payment requirements of Section 2.7(d).

Based on the foregoing, it is determined that the Required Lenders' attempted waiver of the Section 2.7(d) mandatory prepayment obligation was not effective.

## F.   No Claim Of Bad Faith Has Been Stated

The Citadel Funds also claim breach of the implied covenant of good faith and fair dealing, contending that Aquila was "required" to retire or defease the Senior Notes by September 15, 2004. Based on their assumption that such a contractual obligation

---

subsection. The difference in language in the two subsections does not have any substantive effect in this case. The combination of a requirement for the consent of each Lender affected by an extension of time, and provision that all such amendments or modifications affect all Lenders equally, has the effect of requiring unanimity for any waiver.

existed, the Citadel Funds conclude that Aquila's failure to pay off the 6.875% Senior Notes in time to avoid a Special Mandatory Prepayment is an act of bad faith, rather than the exercise of Aquila's express contractual rights.

However, there was no affirmative requirement anywhere in the Credit Agreement that Aquila retire, refinance or defease the 6.875% Senior Notes, or make any efforts to do so. Indeed, repaying the Senior Notes on October 1, 2004, when they actually were due, would have otherwise been expected. Given that the decision whether to wait and pay the Senior Notes when they became due was an option left available to Aquila under the Credit Agreement, the Citadel Funds have no grounds to claim that Aquila's decision to do so, thereby triggering Section 2.7(d), was a breach of any express or implied provision of the Credit Agreement, much less an act of bad faith.

Finally, the Citadel Funds do not and cannot respond to Aquila's argument and authorities establishing that claims for breach of the implied covenant of good faith and fair dealing are routinely dismissed where the conduct at issue is also the predicate for a claim that the defendant breached an express contract. See, e.g., Concesionaria DHM, S.A. v. Int'l Fin. Corp., 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004) (quoting TVT Records v. Island Def Jam Music Group, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003)).

## Conclusion

For the foregoing reasons, the action is dismissed in its entirety, with prejudice. Furthermore, it is ordered that funds held in escrow pending the disposition of this action be returned to Aquila within five (5) days of entry of this opinion.

It is so ordered.

New York, NY
May 18 , 2005

ROBERT W. SWEET
U.S.D.J.